UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GORDON GAMM, Individually and On Behalf of All Others Similarly Situated, | Case No. 16 Civ. 8420 (RMB) |
| Plaintiff, | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | |
| SANDERSON FARMS, INC., JOE F. SANDERSON, JR., D. MICHAEL COCKRELL, and LAMPKIN BUTTS, | DEMAND FOR JURY TRIAL |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Gordon Gamm ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sanderson Farms, Inc. ("Sanderson Farms" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Sanderson Farms securities between December 17, 2013 and November 17, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Sanderson Farms, an integrated poultry processing company, produces, processes, markets, and distributes fresh, frozen, and prepared chicken products in the United States.  It operates within a commodity industry that is highly concentrated, with a small number of large producers in the United States controlling supply.

3.      For decades, poultry had been volatile in a very predictable way: When times were good, companies flooded the market with chicken, causing prices to crash.  However, all of that cyclical predictability ended when—unbeknownst to the market-- Sanderson Farms began engaging in collusive activities with its poultry producer cohorts, including (but not limited to) major players like Tyson Foods, Inc. ("Tyson"), Pilgrim's Pride Corporation ("Pilgrim's Pride"), and Perdue Farms, Inc. ("Perdue").  Determined to maintain a consistent trend of profitability rather than "suffer" the ebbs and flows that had always been characteristic of the industry, Defendants and their fellow poultry producers began coordinating a mass reduction of the broiler chicken supply, which included, among other things, destruction of eggs.  Nevertheless, throughout the Class Period, Sanderson Farms represented in all of its SEC filings that it participated in a competitive market.

4.      Sanderson Farms along with its competitors effectuated their collusive efforts and ensured that each conspirator "towed the line" in part by keeping tabs on each other using Agri Stats, a highly detailed industry index not available to the public.  Sanderson Farms participates in Agri Stats through which it exchanges material, non-public information about pricing, sales, and production with other poultry producers.  Moreover, each Defendant has conceded that they use and rely upon Agri Stats during almost every earnings call that took place during the Class Period. Agri Stats, which is supposed to be anonymous, in fact includes torrents of detailed information (described below), unprecedented in any other industry, that allows its subscribers to pinpoint which members of the industry are referenced with troubling accuracy.  Defendants never disclosed to investors that the Company used Agri Stats to inflate and fix broiler chicken pricing.

5. Moreover, Defendants also hid their collusive efforts to prop up the price of broiler chicken reflected on an industry index known as the Georgia Dock. The Georgia Dock is compiled by the Georgia Department of Agriculture ("GDA") and is used by the industry as a benchmark to set broiler prices. The Georgia Dock index is compiled by one employee at the GDA who gathers unverified data from poultry producers, many of whom also sit on an Advisory Board that maintains control over the index. Any poultry producer that submits a price to the index that differs by more than "one cent" from other participants is not included in the index.

6. Throughout the Class Period, despite their covert collusive price fixing activities, which resulted in inflated fixed broiler chicken prices, Defendants consistently and falsely represented that their industry was "highly competitive" and that they engaged in "significant competition" with their industry peers. Moreover, Defendants also misleadingly reported significant revenue from poultry sales, touted rising prices and the record highs of the Georgia Dock index, without disclosing that those prices and related financial results stemmed from their anticompetitive conduct. Such conduct included, but was not limited to, agreements with fellow poultry producers (including Tyson, Perdue, and Pilgrim's Pride) to reduce broiler supply, destroy eggs, ensure complicity through detailed information sharing via Agri Stats, and inflate the Georgia Dock index pricing that Sanderson Farms used for a material portion of its contracts. These activities rendered Defendants Class Period statements false and misleading and raised a risk, unknown to the market, that Sanderson Farms could face antitrust litigation, regulatory scrutiny, and resulting reputational damage.

7. On September 2, 2016, the market had its first taste of Defendants' fraud, when Maplevale Farms, Inc. filed an antitrust class action complaint in U.S. District Court for the

3

Northern District of Illinois (the "Maplevale Complaint") against Sanderson Farms and several other poultry producers, including Tyson Foods, Inc. ("Tyson"), Pilgrim's Pride Corporation, and Perdue Farms, Inc., alleging that Sanderson Farms and the other companies named in the complaint had conspired since 2008 to manipulate the prices of broiler chickens in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act").[1]

8.     Other antitrust lawsuits quickly followed.  On October 4, 2016, a group of individual consumers filed an antitrust class action complaint in U.S. District Court for the Northern District of Illinois (the "Monahan Complaint") against Sanderson Farms and several of its industry peers, including Tyson and Pilgrim's Pride, alleging violations of the Sherman Act.[2] Specifically, the Monahan Complaint alleged, in part:

> [Defendants] now electronically transfer vast amounts of production data . . . [to] provide[] Defendant Producers with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies.  This permits the Defendant Producers to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on broiler breeder flock data that is reported and shared.
>
> . . .
>
> Defendant Producers' restriction of broiler supply had the intended purpose and effect of increasing broiler prices to Plaintiffs and the Class.  As a result of Defendant Producers' unlawful conduct, Plaintiffs and the other members of the Class paid artificially inflated prices for broilers during the Class Period.

9.     Following the filing of the Monahan Complaint, Sanderson Farms' share price fell $3.98, or 4.14%, to close at $92.21 on October 4, 2016.

10.     *Notably, the Maplevale and Monahan Complaints did not reveal Defendants manipulations of the Georgia Dock price index.*

---

[1] *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, 1:16-cv-08637 (N.D. Ill. Sept. 2, 2016).
[2] *Monahan et al. v. Koch Foods, Inc. et al.*, 1:16-cv-09490 (N.D. Ill. Oct. 4, 2016).

11.     Then, on October 7, 2016, Pivotal Research downgraded Tyson from "Hold" to "Sell" stating, "if poultry seems too good to be true, it may be."  Explaining the downgrade, analyst Timothy Ramey cited the "powerfully convincing" allegations of price manipulation by the defendants named in the Maplevale Complaint, which includes Sanderson Farms.  As Ramey cogently recognized, the major risks created by Sanderson Farms' and its cohorts activities during the Class Period with regard to broiler pricing include a finding of industry collusion, antitrust violations, and potential scrutiny by the Department of Justice or Federal Trade Commission.

12.     On news of the downgrade by Pivotal Research, Sanderson Farms' share price fell $4.03, or 4.32%, to close at $89.15 on October 7, 2016.

13.     The market learned that Defendants' anticompetitive conduct went even further than what the Maplevale and Monahan Complaints described, when the New York Times published article on November 3, 2016, titled, "You Might be Paying Too Much for Your Chicken."  That article revealed for the first time that the United States Department of Agriculture had initiated an inquiry into the Georgia Dock index, questioning the accuracy of the unverified data Sanderson Farms and its co-conspirators provided for compilation of the index. Indeed, the article pointed out that the Georgia Dock price for chicken differed significantly from the prices provided for in similar indices, such as the Urner Barry index.

14.     Following publication of the New York Times article, Sanderson Farm stock plummeted $6.31, or almost 7%, on unusually high volume.

15.     Then, on November 17, 2016, The Washington Post published an article titled, "If you thought you were paying fair prices for chicken at the supermarket, think again."  The article revealed new information, provided by director Arty G. Schronce from the Georgia Department

of Agriculture, demonstrating that Sanderson Farms and its major competitors had been manipulating the Georgia Dock index to prop up chicken prices.  The Washington Post obtained a memorandum circulated internally by Schronce at the Georgia Department of Agriculture questioning the credibility of the process undertaken to compile the index and the accuracy of the pricing information.  He further voiced concern over the control exerted by an Advisory Board over the Georgia Dock index, which consisted of executives from many of the major poultry producers that provided data to the index.

16.     Based on Sanderson Farms' SEC filings and investor presentations, the Georgia Dock index impacts 40% of its contract volume.  In other words, if the industry is forced to stop using the index, leaving only the accurately lower priced indices, it will have a material impact on Sanderson Farms' bottom line.

17.     In response to these shocking revelations, Sanderson Farms stock price continued to plummet for the next three consecutive trading days on unusually high volume, closing on November 21, 2016 at $78.98—a three day loss of almost 8%.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b), 14(e) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(e) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Sanderson Farms' stock trades on the NASDAQ, located within this Judicial District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23.     Plaintiff, as set forth in the attached Certification, acquired Sanderson Farms securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     Defendant Sanderson Farms is incorporated under the laws of Mississippi.   The Company's principal executive offices are located at 127 Flynt Road, Laurel, Mississippi 39443. Sanderson Farms' common stock trades on the NASDAQ under the ticker symbol "SAFM."

25.     Defendant Joe F. Sanderson Jr.   ("Sanderson") has served at all relevant times as the Company's Chief Executive Officer and Chairman.

26.     Defendant Michael Cockrell ("Cockrell") has served at all relevant times as the Company's Chief Financial Officer, Treasurer, and Director.

27.     Defendant Lampkin Butts ("Butts") has served at all relevant times as the Company's President and Chief Operation Officer.

28.     The Defendants referenced above in ¶¶ 25-27 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Sanderson Farms, an integrated poultry processing company, produces, processes, markets, and distributes fresh, frozen, and prepared chicken products in the United States. Throughout the Class Period, Sanderson Farms has represented in its filings with the SEC that:

> Consistent with the poultry industry, the Company's profitability is substantially impacted by the market prices for its finished products and feed grains, both of which may fluctuate substantially and exhibit cyclical characteristics typically associated with commodity markets.

30.     "Broilers" are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.

31.     According to a 2012 report by Focus Management Group, broilers "are a commodity product with little or no product differentiation based on the processors."  There is a single national market for broilers in the United States. Prices for broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (*i.e.*, degree of processing or added value), and packaging at the time of sale. About 50-70% of broilers are sold under contract with a customer, about 10-20% are sold on the spot market (anything left over that is sold fresh within 3 days; referred to in the industry as the "sell it or smell it market"), and roughly 17-20% are exported.

32.     Broilers constitute approximately 98% of all chicken meat sold in the United States. Sanderson Farms is one of the leading suppliers of broilers in an industry with over $30 billion in annual wholesale revenue. The broiler industry is highly concentrated, with a small

number of large producers in the United States controlling supply.  Sanderson Farms is one of those large producers.  Some of its largest industry peers include Perdue, Tyson, and Pilgrim's Pride.

33.     The broiler industry is unique in that is almost entirely vertically integrated— meaning the broiler company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of broilers.  This vertical integration allows the poultry industry, including Sanderson Farms, to manage excess capacity to manage price.

34.     According to a June 2014 United States Department of Agriculture ("USDA") Report, "the [broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns[, including] the exercise of market power by broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

35.     Moreover, the market for broilers is characterized by inelastic supply and demand.  According to a May 2010 paper written by broiler industry consultant Michael Dicks, "[b]ecause of the inelastic nature of the supply and demand [of broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price." A study by consultant The Hudson River Group for Pilgrim's in 2008 found that a one percent decrease in the supply of broilers leads to a 0.8% increase in the price of broilers.  In other words, demand for broilers is inelastic, so a decrease in supply will increase prices. Indeed, demand for broilers has been flat since 2008, while at the same time wholesale broiler prices have risen roughly 50%. Therefore, it is the reduction in the supply of broilers that has led to broiler price increases.

36.     *The vertical integration and inelastic supply/demand that is unique to the broiler industry render it particularly susceptible to collusion by poultry producers.*

**Collusion in the Broiler Industry**

37.     Historically, the broiler industry was marked by boom and bust cycles where, in response to rising prices, producers increased production, which caused an oversupply and resulting decrease in pricing. However, that market pattern changed markedly in recent years— beginning in 2008-- when Sanderson Farms and several other large producers in the broiler industry colluded to prop up broiler prices during periods of rapidly falling input costs by, among other means, coordinating supply restrictions and manipulating one or more broiler price indices. These actions raised the risk that Sanderson would face antitrust litigation, regulatory scrutiny, and/or reputational damage.

**Coordinating Supply Restrictions**

38.     Both before and throughout the Class Period, Sanderson Farms and others in the poultry industry engaged in coordinated restrictions and reductions of the broiler supply with the intended purpose of increasing broiler prices.  The two largest coordinated reductions took place in 2008 and 2011, but the repercussions of those actions reverberated throughout the Class Period. Sanderson Farms and its cohorts did this by destroying broiler breeder hens in their broiler breeder flocks, which were responsible for supplying the eggs raised into broilers. They also limited the United States broiler supply by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess broiler breeder flocks to Mexico.

39.     As an example, along with their fellow poultry producers, Defendants' undertook a coordinated exportation of broiler hatching eggs from the U.S. starting in 2013 to artificially reduce the supply of broilers in the U.S.

40.     Moreover, when Avian Flu-related export limitations during 2015 caused frozen broiler inventories to build up in the U.S., threatening the stability of broiler prices Defendants had worked so hard to increase, Defendants worked in concert with their co-conspirators to coordinate the dumping of excess inventories of broilers in foreign markets to avoid deterioration of the artificially high prices in the U.S. they'd conspired to create. So excessive was their activity that in early October 2015, Vietnam launched an inquiry into dumping by U.S. broiler producers, including Sanderson, after Vietnamese broiler producers determined that dumping of frozen chicken by U.S. producers had cost it over $120 million in the prior 16 months. A report by Vietnam's Southeast Livestock Association concluded that U.S. broiler companies were selling chicken thighs in Vietnam for 29% of the price of a similar product sold in the U.S. market (e.g., at a Walmart), excluding the additional cost of frozen shipping rates, import duties and other fees associated with U.S. producers selling chicken thighs in the Vietnamese market.

41.     Additionally, to prevent chicken supplies from increasing, as would have been expected as a result of the Avian Flu, Defendants and their industry peers coordinated to break eggs rather than set eggs.

42.     Defendants knew their scheme would work because, as explained, supply and demand in the broiler industry are inelastic. Therefore, a coordinated decrease in supply as alleged herein necessarily will result in an increase in prices. As one industry consultant noted, "[b]ecause of the inelastic nature of the supply and demand [of broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

43.     That price increases stemmed from coordinated supply restriction (among other collusive efforts described below) is demonstrated by the fact that from late 2014 into 2016,

broiler input costs, like corn and soybean prices, fell significantly. Indeed, throughout the Class Period, Defendants touted decreases in feed cost. Economic theory predicts that in a competitive market, all else being equal, broiler prices similarly would fall. Nevertheless, broiler prices during that time period remained artificially inflated and failed to account for the historic drop in corn and soybean prices, *which constitute 50 – 70% of broiler input costs*. Indeed, a Bloomberg News compilation of industry analyst forecasts in November 2013predicted broiler prices would *drop* 7.1% in 2014 due to a 50% fall in corn prices, but instead, broiler prices *increased* 9.2%.

44. Defendants knew and intended that their coordinated limitation and reduction in broiler supply would artificially increase all broiler prices—for spot market and contract sales—above the level they would have been absent the conduct alleged herein.

**Price Index Manipulation:**

**Agri Stats**

45. Defendants and their co-conspirators were able to effectuate their collusive activities in part with by using Agri Stats, Inc., which produces the most detailed poultry price report in the industry. It is not publicly available. According to a May 2010 study prepared for the National Chicken Council ("NCC"), Agri Stats, Inc. is a private company that generates broiler industry data "considerably more detailed than [other price indices for poultry], including data on weighted average price, top third average, bottom third average, and volume traded on a daily, weekly, and monthly basis, and supply, sales volume by detailed product type and form, export, and pricing information for whole and cut-up broilers. These reports are based on actual sales invoices from broiler companies. Only Agri Stats provides Defendants and other producers information with sufficient detail for an informed subscriber to determine with reasonable accuracy producer-specific production, cost, and general efficiency data. Agri Stats also collects

from and reports back to its subscribers detailed statistics on almost every conceivable operating metric within the industry.  At each of the participating poultry company's broiler complexes, an employee is responsible for submitting its data to Agri Stats. Agri Stats relies upon a detailed audit process to verify the accuracy of data from each complex, sometimes directly contacting Defendants to verify data.

46.     That Defendants used and relied upon Agri Stats reports is abundantly clear from the earnings call transcripts that were attached as exhibits to 8-K's filed by Sanderson Farms throughout the Class Period.  Defendants consistently cited the Agri Stats reports during those calls, often basing their answers to analyst questions on data therefrom.

47.     Agri Stats purports to maintain the confidentiality and anonymity of individual company's data by providing each company a report identifying only that company's specific broiler complexes by name, but not identifying by name other broiler producers' complexes described in the report. For instance, in May 2008 Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

48.     However, Agri Stats reports are so detailed that a reasonably informed producer can discern the identity of competitors' individual broiler complexes, and it is common knowledge among producers (but unknown to the market during the Class Period) that others can do so. For example, the specific type or size of a broiler house, breed of chick, average bird size, and production levels listed in Agri Stats data for complexes allows an industry insider to

identify each poultry producer's individual broiler complexes. Discerning a competitors' identity in Agri Stats is often referred to as "reverse engineering."

49.     Sanderson Farms and its industry peers used Agri Stats to facilitate the coordinated reduction of broiler supply and breaking of eggs described above.  Essentially, by reverse engineering the detailed data, the participants in the collusive scheme described herein could discern whether or not their "competitors" were adhering to the coordinated supply restrictions and other anticompetitive conduct.

50.     In addition to separate targeted reports for each major area of operations including, but not limited to, its breeding, hatching, hauling, feeding, processing, selling, and administration, the Individual Defendants also received Agri Stat's monthly "Bottom Line Report." The contents of the Bottom Line report are a closely guarded secret by company executives. The report contains one row for each broiler company reporting to Agri Stats, then has columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information. While each company receives a report that only identifies by name that particular company's "row" in the Bottom Line Report, top executives at each company (including the Individual Defendants) know their competitors well enough to pick out recurring unique data points for other companies such that they are often able to identify competitors on the Bottom Line Report. Furthermore, Tyson, Pilgrim, and Sanderson are public companies which report some aggregated data publicly, which top executives from other companies then can match up against the far more detailed information in the Bottom Line Report to help identify specific data from these companies. In other instances, a company's interest expense data in Agri Stats can be matched up against information already known about each Defendant's debt level.

14

51.     Even in the unlikely event that a producer could not identify a specific competitor's data simply from studying the Bottom Line Report, Agri Stats' employees are able to confirm for Defendants the data for a particular company at quarterly meetings with each company or at the numerous trade association meetings where Agri Stats executives present on a regular basis. For instance, Agri Stats provided a service to Sanderson and its competitors whereby each quarter Agri Stats would meet each poultry producer's executives and make a detailed presentation about company and industry data. At these presentations, Agri Stats would lead detailed discussions about industry profitability and the key factors that contribute thereto, including items such as size and average age of broiler breeder flock, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data the poultry companies provided. At these presentations Agri Stats would also lead discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and top and bottom third of the industry. Agri Stats would also tell company executives how much the industry was over- or undersupplying the market, indicate its estimate of demand, and share other information based on the data Defendants provided. At such meetings, Agri Stats would often be asked to confirm the identity of a particular competitor in an Agri Stats report, which it could do more subtly during the Q&A portion of the meeting. Further, since Agri Stats travelled between the various poultry producers, including Sanderson Farms, regularly and discussed each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among the industry.

52.     The level of detail provided in Agri Stats reports and at Agri Stats presentations is unprecedented and unheard of in any other industry.  It created an environment where Sanderson

Farms and its fellow poultry producers could easily collude through dense information sharing to prop up broiler prices before and during the Class Period.

53.     As reported in a post Class Period February 15, 2017 article published in *Bloomberg Businessweek*, called, "Is the Chicken Industry Rigged?," Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

54.     Agri Stats reports are *only available to participating broiler producers*. Accordingly, there is little publicly available information about even the categories of information contained in the lengthy weekly and monthly reports each broiler producer receives.

55.     There is no plausible, non-conspiratorial justification for Sanderson Farms and its competitors to use Agri Stats to secretly share highly confidential and proprietary information about their pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information would be a closely

guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

56.     Indeed, the FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines"), and presentations by FTC attorneys, suggest that Agri Stats is far outside the scope of permissible information sharing among competitors. For example:

A. The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion, like the poultry industry.

B. The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that in a competitive industry would be considered trade secrets. Therefore, the competitive sensitivity of Agri Stats reports suggests a particularly high level of antitrust concern.

C. The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations. However, Agri Stats reports are issued weekly and/or monthly, and its EMI reports are issued daily, so as to provide nearly current production, sales, and other data to Sanderson Farms and its fellow poultry producers. Moreover, the nature of broiler breeder flocks is that they predict future broiler supply, so by sharing such information in a way that permits company-by-company identification, poultry companies are in fact sharing future anticipated production information with one another, which clearly suggests high antitrust concern under the FTC/DOJ Guidelines.

D. The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected, but Sanderson Farms and its industry peers account for approximately 90-95% of broiler production.

**The Georgia Dock**

57.     Defendants also manipulated poultry prices by colluding with other industry participants to inflate the price of broilers reflected on an index referred to as the Georgia Dock.

58.     In addition to Agri Stats, broiler prices are reported primarily by three entities: Urner Barry (a commodity price reporting service), the USDA, and the GDA's Georgia Dock. Published prices for broilers from Urner Barry, Georgia Dock, and USDA relate to the spot

market for broilers. However, prices for broilers, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry. For instance, Defendant Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry."  Contracts based on Georgia Dock pricing constitute a material portion of Sanderson Farm's earnings.

59.     The USDA and Urner Barry's broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all broiler producers, but also verification of reported prices from broiler purchasers such as brokers, and customers.  As explained below, and unbeknownst to the market during the Class Period, no such verification process exists for the Georgia Dock.

60.     Throughout the Class Period, Defendants furthered their collusive efforts to prop up broiler prices along with Sanderson Farm's competitors, by manipulating the Georgia Dock index. The Georgia Dock price is compiled on a weekly basis by the GDA. For decades, it has been used by producers and others as a benchmark to set broiler prices. The index is based on data from 10 of the 11 companies that process poultry in the state, including Sanderson Farms. Throughout the Class Period, little if any information was publicly available regarding how the GDA compiled the Georgia Dock price. Unbeknownst to the market, the Georgia Dock's survey methodology made it susceptible to manipulation by broiler producers. To compile the Georgia Dock price index, a GDA director named Arty Schronce called each participating broiler producer company weekly, including Sanderson Farms, to report the price offered to companies with which each company had contracts. A single price was given by each broiler producer company and was accepted without any verification of actual invoices, double-verification with

purchasers, or any other form of auditing to verify accuracy as is done with Urner Barry and the USDA Composite Index.

61.     The broiler companies that participated in the Georgia Dock price survey during the relevant time period all own at least one broiler processing facility located within the State of Georgia, including Sanderson Farms.  According to the GDA, each weekly price report from these broiler producers is weighted to account for the particular company's market share of broilers processed in Georgia (referred to by GDA as that company's "voice"). A preliminary calculation is made based on the single price quotation from each company, then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it" (hereinafter, the "One Cent Rule"). According to internal GDA documents, the One Cent Rule is meant "to shield [] one company having the ability to greatly influence the price up or down."

62.     Sanderson Farms and its cohorts manipulated the Georgia Dock to receive higher than real market prices for its chickens.  ***The manipulation of the Georgia Dock index would require coordination - tacit or explicit. As a producer, your high price quote doesn't work unless others go along because it will be an outlier that gets thrown out per the GDA's methodology***.

63.     Historically, the Georgia Dock price was roughly comparable to the prices reflected by other indices. However, beginning at least in January 2015, the Georgia Dock price began to depart significantly from the pricing reflected by the other indices, including Urner Barry and the USDA Composite Index.  The significant difference between the Georgia Dock price index and other broiler price indices in recent years cannot be explained by only one or two

outlier companies reporting artificially high broiler prices to the GDA, as the One Cent Rule requires that outlier prices deviating by more than one cent from the initial dock price be excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from other indices, which are actually based on verified sales, can only be attributed to all or nearly all participating broiler producers collectively submitting artificially high and identical or very nearly identical broiler prices to the GDA.

64.     To ensure their control over the Georgia Dock price, Defendants and their competitors convinced the GDA to convene a "Georgia Dock Advisory Committee" composed of senior executives from several of Sanderson Farm's co-conspirators to advise the GDA on the Georgia Dock price.  Throughout the Class Period, the existence and conduct of this secret Georgia Dock Advisory Committee was not known to the market.

65.     Indeed, as a result of the questionable data underlying the Georgia Dock index as well as the lack of independence of its Advisory Board, the USDA stopped using the index in August 2016 and insisted the GDA make changes.  The GDA failed to do so.  Such failure can only be explained by its lack of independence given the control exerted by the Advisory Committee, which is made up of poultry producers all of whom submit prices to the Georgia Dock index.  Additionally, the State Ethics Commission's website reveals that all of the Advisory Committee participants have donated to the GDA commissioner, Gary Black, who was re-elected in 2014.  Currently, the USDA publishes its own National Composite price index, which uses 2.5-3.5 pound birds just like the Georgia Dock.  Despite using similar sized birds, the prices reflected on the two indices show a vast discrepancy.

66.     That the discrepancy between the Georgia Dock index and Urner Barry prices also occurred with similar sized birds is evidenced by a conference call hosted by Stephens on October 19, 2016, where Terrence Wells, an Urner Barry poultry expert stated:

> This is our US Grade A sized 2.5 to 3.5lb whole bird.  This is probably the closest item we have that compares to the Georgia Dock.  Now the Georgia Dock whole bird, the last time I checked was listed at $1.10.  Ours is listed at 71 cents right now.  I'm not going to get into any discussion or detail about what might be the disconnect there, but I just want to show you where Urner Barry's quotation for whole birds stands right now in comparison to what one of the other reporting services is currently showing.

67.     As discussed below, it was not until November 2016 that the market learned the reason for the vast discrepancies.

### Factors Suggesting Plausibility: Opportunity and Susceptibility for Collusion

68.     Sanderson Farms and its industry peers are members of several broiler-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Integrated broiler producers have numerous regular events through which they can communicate in person with one another. Defendants had numerous opportunities to conspire, as the Individual Defendants attended and participated in industry trade association meetings. Defendants exploited these meetings to further their collusive aims. Regular and frequent attendance by Defendants Sanderson, Cockrell, and/or Butts along with competitors' CEOs and top level executives at trade association meetings is the norm rather than the exception.

> **The National Chicken Council ("NCC")**: According to its website, the NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States." Sanderson Farms and its co-conspirators are all members.  The CEOs of the top integrated broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC. At minimum, Defendant Butts sat on the NCC Board since at least 2004 and was appointed Charmain of the NCC in October 2011.  In 2016 Defendant Cockrell served on NCC's Communications Committee.   The NCC has three annual board meetings attended by Defendants' and their industry peers' senior executives, including most or all Defendants' CEOs and other top executives. CEOs generally always attend

the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October. Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' and their industry peers' CEOs and top level executives often meet, socialize and golf, hunt, or fish together.

**The United States Poultry & Egg Export Council ("USAPEEC")**: Sanderson Farms and its co-conspirators are all members of USAPEEC. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The group has evolved into an association that is an advocate for the industry on trade policy issues. USAPEEC has about 200 member companies and organizations. USAPEEC holds Board of Directors meetings quarterly and, upon information and belief, includes one or more of the Individual Defendants (or other Sanderson Farms executives that are part of its core operations) and executives from Sanderson Farms' industry peers.

**The U.S. Poultry & Egg Association ("U.S. Poultry")**: U.S. Poultry describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies. Sanderson Farms and its competitors are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall attended by at least one of Sanderson Farms' senior executives that is part of the core operations of the Company.

**The Georgia Poultry Federation**: The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state." The Georgia Poultry Federation has regular meetings each April, August, and September which typically are attended by Sanderson Farms and its competitors' senior executives, who are members.

**The North Carolina Poultry Federation ("NCPF")**: The NCPF "has been the voice of the North Carolina poultry industry since 1968." The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which typically are attended by Sanderson Farms and its competitors' senior executives.

**The International Poultry Expo ("IPE")**: The IPE was held annually from 2008-2012. The IPE billed itself as "the networking hub of the world for the poultry industry." The IPE was held annually in late January in Atlanta, Georgia. Sanderson and its co-conspirators' senior executives, and numerous mid-level executives and other employees,

attended the IPE each year. The International Producers and Processors Expo ("IPPE") is the world's largest annual poultry, meat, and feed industry event. IPPE held its first event in January 2013 and combined three previously separate expos – the IPE, the International Feed Expo, and the International Meat Expo. According to the IPPE's website, a wide range of international decision-makers attend this annual event to network and become informed on the latest technological developments and issues facing the industry. The 2015 IPPE featured more than 7,245 international visitors from over 103 countries, including attendees from Chile, France, Singapore, and Australia. IPPE indicates that Sanderson Farms and its co-conspirators each sent their "Top Management" to the 2014 IPPE in January 2014. The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking regarding the broiler industry. Similarly, Sanderson Farms and its industry peers' senior executives attended IPPE in 2015 and 2016.

**The International Poultry Council ("IPC")**: The IPC was formed in 2005 and is composed of national trade associations from 23 countries, as well as 40 individual companies that are "Associate" members. The IPC website bills the organization as the "voice of the global poultry industry" and its mission is to "strengthen communication between the industries of different countries." The NCC, USAPEEC, and USPOULTRY are members of the IPC on behalf of United States poultry producers, along with individual company members of the IPC, including Tyson, Cobb-Vantress (a Tyson subsidiary), Sanderson Farms, and JBS S.A. (Pilgrim's parent company). Additionally, the Chilean poultry trade association ("APA") and the Australian Chicken Meat Federation ("ACMF") are also members of the IPC.

69.     **Investor Conferences**: Sanderson Farms and its competitors' CEOs and senior executives also participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May and attended by the three Individual Defendants), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Farm to Market Conference (held every May and attended by the three Individual Defendants), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May and attended by the Individual Defendants—indeed in 2015, Defendant Sanderson received the "Poultry Person of the Year" award at the seminar), and JP Morgan Basic Materials Conference (held every June).

70.   **Competitor Plant Touring and Employee Hopping**: Sanderson Farms and its industry peers also permitted one another to tour each other's broiler plants, which revealed confidential business methods employed by a company. While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives. Poultry producers also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base.

71.   **Barriers to Entry**: The existence of high barriers to entry is another factor which makes the poultry industry particularly susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. During the Class Period and continuing today, substantial barriers impede entry into the broiler market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.  In addition, large vertically integrated producers have expressed strong unwillingness to sell idled broiler complexes in order to prevent new entrants.  For example, Sanderson Farms competitor Pilgrim's Pride stated during a February 2014 call that it refused to sell its idle facilities as a "defensive" strategy.

72.     The barriers to entry in the broiler industry have proved insurmountable for potential new market entrants. No company has created a new poultry company from scratch in decades. Further, when one foreign meat company (a Ukrainian company, Omtron) tried to enter the U.S. market in February 2011 by buying a portion of the assets of bankrupt broiler producer Townsend's, Omtron invested $35 million to improve the facility's processing operations, but went bankrupt only five months after making the purchase.

73.     **Similar Cost Structures**: Another factor antitrust law and economics have identified as making markets susceptible to price-fixing, and which is present in the broiler chicken industry, is similar cost structures. The majority of production costs for broiler producers are variable. All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

74.     The single largest cost component of producing broilers is feed, which primarily consists of soybean meal and corn. Broiler feed prices have varied widely from 2007-2016, reaching 71% of the cost of growing broilers in 2012, but falling to only about 50% by 2014. Input costs other than feed include processing plant labor costs (~15%), materials (~11%), and capital equipment (~2.5%). Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.

75.     *Broiler feed costs have been decreasing sharply since record highs in 2012. For instance, prices for soybean meal were down 10% in 2014. Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%.* ***During the same period, broiler prices increased roughly 50%.***

76.     Sanderson Farms and its competitors have relatively similar cost structures. The technology and process of industrial scale growing and processing broilers is well known and Defendants and their industry peers employ the same types of equipment and processes in the production process. Poultry producers also have only three companies from which they can obtain breeder stock from which to raise broilers, so there are very limited options with respect to purchasing the most cost efficient broiler genetic lines. Similarly, poultry broiler producers all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs for their broilers.

77.     Defendants and their industry peers use Agri Stats to share extraordinarily detailed cost information (as discussed below), so they are able to constantly realign their cost structures with one another. Agri Stats permits each broiler company to have extremely unusual knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.

78.     Broiler companies, including Sanderson Farms, engage in a program of "feedmill cross-testing" in which they exchange feed and chicks with one another for the purported purpose of determining which company's feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.

79.     Another sign that Sanderson Farms and its industry peers do not view production costs as secret is the fact that it is not unusual for them to permit one another's CEOs access to each other's production complexes. In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and

give it a competitive advantage over its competitors. However, this is not the case in the broiler industry.  For example, from April 19-21, 2013, Defendant Butts, Pilgrim's President & CEO Bill Lovette, and Perdue Chairman of the Board Jim Perdue attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Sanderson Farms and its competitors' senior executives.

80.    **Contract Changes**: A coordinated move away from fixed price contracts to contracts that permit prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002). This is precisely what occurred in the broiler market during the Class Period. Historically, many vertically integrated broiler producers offered customers long-term fixed-price contracts of a year or more. This guaranteed customers a fixed price, but also prevented broiler producers from being able to realize market price increases that would naturally result from their planned supply cuts.  However, in recent years, including throughout the Class Period, Sanderson Farms and other of its competitors materially reduced their use of fixed price contracts.  This change coincided with Sanderson Farms and its competitors' efforts to reduce broiler industry supplies so as to drive broiler market prices higher.

### Materially False and Misleading Statements Issued During the Class Period

81.    The Class Period begins on December 17, 2013, when Sanderson Farms filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended October 31, 2013 (the "2013 10-K").  Each of the

Individual Defendants signed the 2013 10-K. In the 2013 10-K, Sanderson Farms talked repeatedly about improved market prices for poultry products and also stated, in relevant part:

**Competition**

The Registrant [Sanderson Farms] is subject to significant competition from regional and national firms in all markets in which it competes. Some of the Registrant's competitors have greater financial and marketing resources than the Registrant.

The primary methods of competition are price, product quality, number of products offered, brand awareness and customer service. The Registrant has emphasized product quality and brand awareness through its advertising strategy.

\*\*\*

*The poultry industry is highly competitive.*

82. Regarding Sanderson's use of the Georgia Dock index, the 2013 10-K stated as follows:

The Company has long term contracts (one to three years) with most of its chill pack customers, and the pricing of this product is based on a formula that uses the Georgia Dock whole bird price as its base. The Georgia Dock whole bird price is published each week by the Georgia Department of Agriculture and is based on its survey of prices and market conditions during the preceding week. As of October 31, 2013, the Company had the capacity to process 5.0 million head per week at its chill pack plants, and its results are materially impacted by fluctuations in the Georgia Dock price.

\*\*\*

Generally, the Registrant prices much of its chicken products based upon weekly and daily market prices reported by the Georgia Department of Agriculture and by private firms. Consistent with the industry, the Registrant's profitability is impacted by such market prices, which may fluctuate substantially and exhibit cyclical and seasonal characteristics.

83. Commenting on market prices and inventories, the 2013 10-K stated:

The increase in cash flows from operating activities of $47.0 million resulted primarily from improved market prices for poultry products during fiscal 2013 as compared to fiscal 2012, and a $27.2 million decrease in live chicken, feed, and

egg inventories attributable to the declining costs of feed grains experienced as we moved through the fourth quarter of fiscal 2013.

84.     That same day, Sanderson Farms held an earnings call with analysts during which they touted the Company's financial results.  On that call Defendant Sanderson stated in relevant part:

Fiscal 2013 was a good year for Sanderson Farms. Overall, poultry markets were much improved for the year compared to 2012, although grain costs in flocks sold were up substantially for the full fiscal year compared to last year.

***

[W]e will, of course, watch chicken production numbers. We continue to believe that while depleted breeder flocks will remain a constraint to significantly higher production numbers, it is possible the industry could produce 2.5% to 3.5% more chicken during 2014.

On the same call, Defendant Butts stated in relevant part:

The average Georgia Dock price during our fourth was approximately 10.9% higher than last year's fourth quarter, averaging $1.06 per pound for the quarter. For the year, the Georgia Dock averaged $1.03 per pound, which represented a 10.4% increase over the $0.93 per pound average during fiscal 2012. The Georgia Dock price is currently $1.0425 per pound. As many of you know, the Georgia Dock price is a good indicator of supply and demand dynamics for products sold to retail grocery stores.

***

We competed well in the industry during 2013 in terms of operating efficiencies.

85.     The foregoing statements made by Defendants on December 17, 2013 were false and misleading because, throughout the Class Period, despite their covert collusive price fixing activities, which resulted in inflated fixed broiler chicken prices, Defendants consistently and falsely represented that their industry was "highly competitive" and that they engaged in "significant competition" with their industry peers.  Moreover, Defendants also misleadingly reported significant revenue from poultry sales, touted rising prices and the record highs of the Georgia Dock index, without disclosing that those prices and related financial results stemmed

from their anticompetitive conduct.  Such conduct included, but was not limited to, agreements with fellow poultry producers (including Tyson, Perdue, and Pilgrim's Pride) to reduce broiler supply, destroy eggs, ensure complicity through detailed information sharing via Agri Stats, and inflate the Georgia Dock index pricing that Sanderson Farms used for a material portion of its contracts.  These activities rendered Defendants Class Period statements false and misleading and raised a risk, unknown to the market, that Sanderson Farms could face antitrust litigation, regulatory scrutiny, and resulting reputational damage.

86.    On February 25, 2014, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended January 31, 2014 (the "Q1 2014 10-Q").  In the Q1 2014 10-Q, Defendants represented that, "The Company competes with regional and national firms, some of which have greater financial and marketing resources than the Company."  The Q1 2014 10-Q further stated:

> Consistent with the poultry industry, the Company's profitability is substantially impacted by the market prices for its finished products and feed grains, both of which may fluctuate substantially and exhibit cyclical characteristics typically associated with commodity markets.

87.    On February 25, 2014, Sanderson also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q1 2014 10-Q (the "Q1 2014 8-K").  In the press release, Defendants once again represented that Sanderson Farms "*competes with regional and national firms*" and also stated, in part:

> While broiler egg sets have been higher than the previous year's levels most every week since last August, the industry remains constrained by limited breeder stock supplies. As a result, we don't expect a significant increase in domestic chicken production until the second half of calendar 2014 at the earliest. Healthy, fully employed and confident American consumers could easily absorb the additional

chicken production indicated by higher broiler egg sets if we see further improvement in macroeconomic conditions.

88.     The Company also held a conference call that same day, a transcript of which was also attached to the Q1 2014 8-K as an Exhibit.  During the call, Defendant Sanderson stated in relevant part:

> The first fiscal quarter marked a solid start to fiscal 2014. Demand from retail grocery store customers has remained stable and that stability has reflected in a Georgia Dock whole bird price that hovered near record territory throughout the first quarter.
>
> ***
>
> [W]e will, of course, watch chicken production numbers and consumer spending behavior. It is possible the industry could produce 2% to 3% more chicken during 2014 than last year.
>
> ***
>
> I know the industry wants to expand. I can tell by the age of this breeder flock and but the breeder flock is doing every -- there's 200 -- almost 201 million eggs is all the industry can do right now. Cannot do anymore than that. It's doing everything it can do. Might get a little bit better when Springtime gets here, gets a little warmer and the days get a little longer, the hens may be a bit more productive. But flocks doing all that it can do right now.

89.     The foregoing statements, made by Defendants on February 25, 2014, were false and misleading for the reasons stated in paragraph 85 above.

90.     On May 29, 2014, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended April 30, 2014 (the "Q2 2014 10-Q").  In the Q2 2014 10-Q, Defendants once again claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

91.     On May 29, 2014, Sanderson also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q2 2014 10-Q (the "Q2 2014 8-K").   In the press release, Defendants once again falsely represented that Sanderson Farms "competes" with its industry peers and also stated, in part:

> Looking ahead, we are reasonably optimistic as we head into the summer months and what is typically the peak demand period for chicken. Total grain costs have moved higher but remain below last year's prices, and demand for chicken products is expected to remain strong. Weekly broiler egg sets continue to run slightly above last year's numbers, but breeder placements remain constrained. It appears the reduced size of the breeder flock will constrain production over the short term despite higher industry returns. While macroeconomic conditions continue to affect consumer behavior, market prices for boneless breast meat sold to our food service customers improved through April and May, and market prices for retail grocery store products have also moved higher. Regardless of market conditions, however, we will maintain our focus on maximizing our operating performance and sales execution.

92.     That same day, Sanderson Farms hosted an earnings call attended by the Individual Defendants, a transcript of which was also attached to the Q2 2014 8-K as an Exhibit. On that call, Defendant Sanderson stated in relevant part:

> The average Georgia Dock price was 4.3% higher during the quarter than last year, reflecting continued strong retail grocery store demand.
>
> ***
>
> In addition to our cost we will be closely watching chicken markets and production numbers. Weekly excess continued to trend slightly higher than a year ago. The breeder flock however remains constrained and given the size of the breeder flock I don't expect to see a significant increase in production over the short term.

When asked about supply levels, Defendant Sanderson stated:

> I have talked with one of the primary breeders this week. And we still believe that you are not going to see a significant increase in pullets on the ground this year. They had -- the primary breeders had cut their stock back because the industry was cut back. When they were being asked to for more pullets, they had to go get housing. And they had -- the housing they had before, either have been abandoned

or put to other use, they had to recruit growers. They had to -- those growers had to get financing which take some time and they had to build the houses and that's a year long process. And then they had to grow the grandparent stock and they had to produce parent stock.

So my guess is pullet placements for calendar year 2014 are going to be up 2% to 2.5% and then you'd probably see some more in 2015 on top of that. So I don't think you are going to see very much this year. I think it will be next year, some time before you will see significant expansion. And then what we have out in the field, the breeder flock we have out in the field right now, if you look at Agri Stats, you will find most of them are as productive as they were a year ago with one exception. There is a male out there that has slipped. We happened to -- that is the male that we have. And it is just not as productive it has been in the past. We are having to keep hens longer because of low hatch. And some of it is our fault, the way we have handled the male, and some of it is the male itself has slipped and is not as productive as it was.

And we can see that in our own operations and we can also see it, that male at other operations if you look at Agri Stat. So that's why the hatch and if you look at the hatch on USDA numbers, it's down 1%. But it is only occurring at that one male which is 20%, 25% of industry production. All the other breeds are doing about what they did a year ago.

On the same call, Defendant Butts stated in relevant part:

The average Georgia Dock price during our second quarter was 4.3% higher than last year's second quarter, averaging $1.06 per pound during the quarter compared to $1.015 per pound last year. The Georgia Dock price for this week is $1.095 per pound which compared to $1.05 per pound for the same week last year.

The Georgia Dock price reflects continued strong demand for chicken in retail grocery stores and remains at record levels.

93.     The foregoing statements, made by Defendants on May 29, 2014, were false and misleading for the reasons stated in paragraph 85 above.

94.     On August 26, 2014, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended July 31, 2014 (the "Q3 2014 10-Q").  In the Q3 2014 10-Q, Defendants once again claimed that the "Company competes with regional and national firms"

and repeated its prior misleading statements regarding the market prices of poultry and inventory

levels.

95.     On August 26, 2014, Sanderson also issued a press release, subsequently filed as

an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell,

reiterating certain of the financial and operating results previously announced in the Q3 2014 10-

Q (the "Q3 2014 8-K").   In the press release, Defendants once again falsely represented that

Sanderson Farms "competes" with its industry peers and also stated, in part:

> Sanderson Farms' financial results for the third quarter of fiscal 2014 reflect
> continued favorable market conditions. . . . Market prices for poultry products
> were higher than the third quarter of fiscal 2013, as the Georgia Dock whole bird
> price remained historically high during the quarter. The higher Georgia Dock
> price reflects good retail grocery store demand. While boneless breast meat prices
> peaked below last year's high, they remained above $2.00 per pound through June
> and into July.

96.     That same day, on an earnings call attended by each of the Individual Defendants,

a transcript of which was also attached to the Q3 2014 8-K as an Exhibit.   During the call,

Defendant Sanderson stated in relevant part:

> The higher market prices for fresh chicken during the quarter compared to last
> year's third quarter were driven in part by continued record high Georgia Dock
> whole bird prices and higher prices for boneless breast meat.   These increases
> were fueled by steady demand for chicken and the retail grocery store market and
> continued good white meat demand in food service.

Moreover, Defendant Sanderson engaged in the following conversation with one analyst

regarding egg sets:

> Ken Goldman - JPMorgan
>
> Thank you. A couple questions, and to build a little bit on some of the questions
> that were asked earlier including Farha's, Joe, I know you don't like to speculate,
> but I'm going to try anyway. If there were had been no genetic issues in the
> breeder flock, hypothetically no avian flu in Mexico, normal pullet flock -- or
> normal age, rather, what would your best guess be for how many eggs would be
> set these days? Because some of the numbers you threw out for next year, they
> just seem a little light given some of the margins we are seeing right now. Or

maybe you are saying its 2% to 3% increased breeder flock versus meat production. I just want to make sure I understood those numbers and kind of see where you think things would have been in a more normal environment.

Joe Sanderson

Well, here is what I think -- here is my idea, the industry is setting 206 million eggs a day right now, and they're not going to let up. So when we're going to get to November and I think that's going to be too many chickens. And if you go back and look at last November/December, I think boneless breast went down to $1.36 pound or $1.33.

So if that happens my guess is we're going to get to January and they're going to see $1.33. Now I think everybody would be profitable, but then they're going to be profitable as they are right now. And so, I don't know that you are going to see 210 million eggs in January and to $1.33 boneless and let's say leg quarters are at 40 by then or 38 or whatever.

So I don't they are going to put the petal to the metal necessarily in January. And I don't know, I can't -- if we get PED virus again and beef is going to be high regardless, if PED virus starts spreading around again and we're at 206 million eggs, then you might see them pushing that breeder flock and that way I think you could get 210 million eggs starts showing up. But to do that, they really don't have to push that breeder flock. They don't have to hold them like they are doing right now.

We won't have to do that. We don't have the hens. We don't have the eggs and by that time we'll have our hatch bag and we are going to have plenty of eggs in our hatch and we won't have to do ours, but the industry will have to hold, I believe, will have to hold hens to get up to a big egg number.

Ken Goldman - JPMorgan

That makes sense. Let me just ask a follow-up if I can, which --

Joe Sanderson

You bet. You bet.

Ken Goldman – JPMorgan

Just having covered this industry for a little while now, what you're describing is a rational process. But what we are seeing over time is that even though a little bit of game theory here, the industry should be rational, sometimes certain players within the industry don't necessarily play nicely in the sandbox, right? They are trying to maximize short-term profit.

Joe Sanderson

Yes. I am not suggesting that. I think the industry if it could, would set more than that. But I think they're constrained yet by the breeder flock, from the primary breeders, the breeder flock and -- I wonder how much processing capacity is out there.

Ken Goldman - JPMorgan

Are the lenders still holding back or are the lenders -- I figured that was long gone by now.

Joe Sanderson

No, no, no. Who needs to borrow any money?

Ken Goldman - JPMorgan

Right. Well, I don't know how bad the balance sheets really were for some of your smaller competitors, but I assume they're all in good shape now.

Joe Sanderson

I know too, but I just don't know how much processing capacity is out there and there are three or four plants that are not running right now to match. At the peak in 2007 we were setting 220 million eggs and there are several plants that are closed today that were part of it 220 million eggs.

So, I am guessing processing capacity is maybe 210 million or 212 million eggs. I am guessing; I don't know that. I don't know what it is. But I just -- I think there are still some constraints in the primary breeders, and I am just telling what my primary breeder told me, and I think 2% to 3% is the number. There might be some more gains and lab weight from big bird deboning people.

Moreover, Defendant Sanderson said the following in response to questioning about the cyclical nature of the poultry industry:

Because I've asked you the question, like is there anything different about this cycle than other cycles, and you said pretty much no. I was like …

**Joe Sanderson**

I don't … I think people are just constrained a little bit. I just don't think they can blow the roof off the building right now.

**Ken Zaslow - Bank of Montreal**

But every cycle ends with a loss, right …

**Joe Sanderson**

Eventually, yes. Eventually -- I can't say yet. We're getting cover from beef and pork right now. And I know pork is crashed the last two weeks, but I don't think that's going to last either.

**Ken Zaslow - Bank of Montreal**

Okay. Fair enough. I just think that, again, it seems like the production cycle -- you can't increase production, you have lower corn prices and you have high cost …

**Joe Sanderson**

I agree with that 100%. I don't …

**Ken Zaslow - Bank of Montreal**

Perfect, thank you very much.

On the same call Defendant Butts stated as follows:

Overall market prices for poultry products were higher during the quarter when compared to our third quarter last year. The Georgia Dock whole bird price during our third quarter averaged $1.11 per pound compared to $1.05 per pound average during last year's third quarter.

The Georgia Dock price for this week is $1.1275 per pound, which compares to [$1.0650] per pound for the same week last year. The Georgia Dock price continues to reflect good demand for chicken in retail grocery stores.

97.   The foregoing statements, made by Defendants on August 26, 2014, were false and misleading for the reasons stated in paragraph 85 above.

98.   On December 18, 2014, Sanderson Farms filed an Annual Report on Form 10-K with the SEC, signed by each Individual Defendant, announcing the Company's financial and operating results for the quarter and fiscal year ended October 31, 2014 (the "2014 10-K").  In the 2014 10-K, Defendants once again claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

99.   In the 2014 10-K, Sanderson Farms stated, in part:

**Competition**

The Registrant is subject to significant competition from regional and national firms in all markets in which it competes. Some of the Registrant's competitors have greater financial and marketing resources than the Registrant.

The primary methods of competition are price, product quality, number of products offered, brand awareness and customer service. The Registrant has emphasized product quality and brand awareness through its advertising strategy.

***

The poultry industry is highly competitive. Some of our competitors have greater financial and marketing resources than we have.

In general, the competitive factors in the U.S. poultry industry include:

- price;

- product quality;

- brand identification;

- breadth of product line and

- customer service.

Competitive factors vary by major markets. In the food service market, competition is based on consistent quality, product development, service and price. In the U.S. retail grocery market, we believe that competition is based on product quality, brand awareness, price and customer service. Our success depends in part on our ability to manage costs and be efficient in the highly competitive poultry industry.

***

The Company competes with regional and national firms, some of which have greater financial and marketing resources than the Company.

***

The Georgia Dock whole bird price is published each week by the Georgia Department of Agriculture and is based on its survey of prices and market conditions during the preceding week.

***

Generally, the Registrant prices much of its chicken products based upon weekly and daily market prices reported by the Georgia Department of Agriculture and by

38

private firms. Consistent with the industry, the Registrant's profitability is impacted by such market prices, which may fluctuate substantially and exhibit cyclical and seasonal characteristics. The Registrant will adjust base prices depending upon value added, volume, product mix and other factors.

*** 

The price for Georgia Dock whole birds, which reached its historical high during the Company's fourth fiscal quarter of 2014, averaged 5.7% higher during fiscal 2014 as compared to the average during fiscal 2013.

100.   On December 18, 2014, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the 2014 10-K (the "2014 8-K").   The press release, wherein Defendants once again falsely represented that Sanderson Farms "competes" with its industry peers, stated, in part:

While poultry markets improved only slightly compared to fiscal 2013, grain prices, especially corn prices, were significantly lower during the year when compared to fiscal 2013.

101.   That same day, Sanderson Farms held an earnings call attending by all three Individual Defendants a transcript of which was also attached to the 2014 8-K as an Exhibit.   On that call, Defendant Sanderson stated in relevant part:

Overall poultry markets improved only slightly for the year compared to 2013, but grain cost and flocks sold were substantially lower for the fourth quarter and the full fiscal year compared to last year. Our net sales for the full year of $2.775 billion or 3.4% increase over fiscal 2013 were another record for Sanderson Farms.

During the same call, Defendant Butts stated in relevant part:

As Joe said, overall market prices for chicken improved only slightly during the year, but we benefitted from significantly lower grain cost for the year. The average Georgia Dock price during our fourth quarter was approximately 7.1% higher than last year's fourth quarter averaging $1.13 per pound for the quarter.

> For the year, the Georgia Dock averaged $1.09 per pound which represented a 5.7% increase over the $1.03 per pound average during fiscal 2013. The Georgia Dock price is currently $1.1375 per pound.

Moreover, once again, Defendants confirmed that prices for chicken in fact should have been lower (and would have been absent collusion) when Defendant Butts admitted that "For the year, we paid $182.5 million less for feed grains when compared to fiscal 2013," and Defendant Sanderson stated, "Our feed grain cost during fiscal 2014 were significantly lower than during fiscal 2013 and we expect even lower cost during fiscal 2015." Defendant Cockrell also spoke about increased net sales despite decreased feed costs (which he identifies as comprising almost half the "cost of goods sold") and decreases in the overall cost of sales as compared to the prior year:

> Net sales for the quarter totalled $760.9 million and that's up from $727.1 million for the same quarter last year. The increase in net sales for the quarter reflects an 8.7% increase in our average sales price of poultry products compared to last year and a decrease in poultry pounds sold at 6.1%.
>
> Our cost of sales of poultry products for the quarter ended October 31 decreased 11% when compared to the same quarter during fiscal '13. This decrease is a result of a 17.1% decrease in the cost of feed and broilers processed during the quarter and a 6.1% decrease in poultry pounds sold.
>
> For the fiscal year, our net sales totalled $2.775 billion and as Joe said that's up 3.4% from the $2.683 billion last year. Cost of sales for the year decreased 5.2% compared to a year ago and totalled $2.254 billion. Our average sales price in poultry products sold during the fiscal year was up just under 1% compared to last year and the average cost per pound in our poultry business decreased $6.02 or 8.3% compared to last year reflecting the lower grain cost.
>
> For the year, grain cost comprised 48.5% of cost of goods sold and that compares to 54.2% last year.

Defendant Cockrell also stated as following regarding the Georgia Dock:

> I would anticipate to Georgia Dock moving backup first two weeks of January that would not surprise me a bit if it move back – its strong and I anticipate a good Georgia Dock.

102.    Moreover, an analyst on that call questioned why Sanderson did not expect chicken production to increase more than 2-3% in light of the trend of profitability in the industry.  Defendant Sanderson continued to hide the anti-competitive conduct of the Company and its industry peers and responded as follows:

> Well it's raining about 2% to 3% right now. I believe it could [Indiscernible] at the last exit which saw over – it's running about 2.9% and I think they are pushing the flock right now. And if you go back and look at the bigger flock in 2011 and that's kind of the size of the breeder flock we're in – we're looking to have say about the spring of this year 2015 and then you look at the exits of that breeder flock, that would indicate to me egg sets of 207 million, 208 million eggs peak [ph] 209 and that kind of matches what we think is close to processing capacity and that also maybe housing capacity.
>
> We think there's a little constraint with housing capacity. We don't think there's a lot of extra housing out there; we think people are having trouble getting their houses built. There's not a lot of -- it's difficult to get houses built, there's not a lot of people out there that have extra houses and there's not a lot of people building houses. I'm talking about builders. So that's what I'm talking about. I think it's more of a 2016 deal than it is 20. I think this is going to take the industry that long to get all the infrastructure in place to – I think the primary breeders will be ready, but I don't know that the industry will be ready to really ramp up too much.

103.    The foregoing statements made on December18, 2014 were false and misleading for the reasons stated in paragraph 85 above.

104.    On February 24, 2015, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended January 31, 2015 (the "Q1 2015 10-Q").  In the Q1 2015 10-Q, Defendants once again claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

105.    On February 24, 2015, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant

Cockrell, reiterating certain of the financial and operating results previously announced in the Q1

2015 10-Q (the "Q1 2015 8-K").  In the press release, Defendants once again falsely represented

that Sanderson Farms "competes" with its industry peers and also stated, in part:

> Broiler egg sets have been higher than the previous year's levels every week since
> last summer, and the industry has also increased breeder stock supplies.
> Financially healthy, fully employed and confident American consumers could
> absorb the additional chicken production indicated by higher broiler egg sets if we
> see continued improvement in macroeconomic conditions and relatively low
> gasoline prices.

106.    On an earnings call that same day, attended by all three Individual Defendants, a

transcript of which was also attached to the Q1 2015 8-K as an Exhibit, Defendant Sanderson

reiterated the financial results reported in the Q1 2015 10-Q, and stated in relevant part:

> Demand from retail grocery store customers has remained strong and that stability
> has reflected in Georgia dock whole bird price that hover at or near record
> territory throughout the first quarter.

***

> …overall our market prices for chicken were higher during the quarter compared
> to last year, market prices for corn and soybean meal were all lower, were both
> lower. Our feed costs were down $0.325 per pound for chicken processed during
> our first fiscal quarter.

During the call, an analyst questioned Defendant Sanderson on why the trend of profitability in

the industry had uncharacteristically been longer than in the past:

> **Akshay Jagdale**
>
> And just one last one, just in terms of your feel of what's happening in the
> industry this time around this cycle obviously it lasted -- people are making
> money much longer in this cycle than we've seen pretty much ever. I mean is the
> industry behaving any differently in this prosperous period than you've seen in
> the past or you still believe that it's pretty much behaving the same way there was
> just some structural constraints that have exceeded the growth?
>
> **Joe Sanderson**
>
> I think there is structural constraints, I think breeder flock is one, I think
> processing capacity is another one, hatchery capacity is another, I think there're

physical constraints -- I don't think you have a different generation leading the companies and I don't know that they want to build complexes.

**Akshay Jagdale**

So you do think it's a little different because that's previously you didn't think so, is it fair to say your thoughts have changed a little bit there?

**Joe Sanderson**

Maybe…

107.    Later on the call, Defendant Butts stated in relevant part:

As Joe mentioned market prices for poultry products were higher during the quarter when compared to our first quarter last year. The Georgia Dock price for whole birds reflected continued strong chill pack demand during the quarter and averaged $1.14 per pound compared to last year's $1.04 per pound.

Moreover, falsely implying that Sanderson Farms in fact engaged in competition with its industry peers, Defendant Butts stated:

…we'll do everything we can to meet our goal of performing at the top of our industry.

108.    Defendant Cockrell touted Sanderson Farm's stellar quarterly results without acknowledging that they stemmed from anticompetitive activity.  Defendant Cockrell stated in relevant part:

Net sales for the quarter totaled $667.4 million and that's up from 584.9 million for the same quarter last year. Our net income of $2.87 a share during the quarter compares to net income of $1.25 per share again last year's first quarter. Our cost of sales of poultry products for the three months into January 31 as compared to the same three months a year ago decreased 0.6%. This decrease is a result of lower feed cost offset by the increase in pounds of poultry products sold.

Our feed cost per pound and poultry products processed during the quarter decreased 10.1% or to $0.0291 per pound and that compares to $0.0324 per pound last year. While our feed cost per pound of poultry products processed were low about $0.0327 per pound, our sales price per pound of poultry products sold increased 5.3% or $4.1 per pound compared to last year. This combination resulted in significantly improved gross margins.

109.    The foregoing statements, made by Defendants on February 24, 2015, were false and misleading for the reasons stated in paragraph 85 above.

110.    On May 28, 2015, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended April 30, 2015 (the "Q2 2015 10-Q").  Specifically, the Company reported net income of $71.2 million or $3.13 per share for the second fiscal quarter of 2015 as compared to net income of $51 million or $2.21 per share during the prior year second quarter. In the Q2 2015 10-Q, Defendants once again claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

111.    On May 28, 2015, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q2 2015 10-Q (the "Q2 2015 8-K").   In the press release, Defendants once again falsely represented that Sanderson Farms "competes" with its industry peers and also stated, in part:

> Looking ahead, we are optimistic as we head into the summer months and what is typically the peak demand period for chicken. Total grain costs remain below last year's prices, and demand for chicken products remains strong. Weekly broiler egg sets continue to run above last year's numbers, and breeder placements are higher. However, macroeconomic conditions continue to improve, and the market has absorbed the increased production well during the first half of our fiscal year. Market prices for boneless breast meat sold to our food service customers improved through April, and market prices for retail grocery store products remain at record levels. Regardless of market conditions, however, we will maintain our focus on maximizing our operating performance and sales execution.

112.    On an earnings call that same day, attended by each of the Individual Defendants, a transcript of which was also attached to the Q2 2015 8-K as an Exhibit, Defendant Sanderson stated as follows:

Lower grain costs and continued good demand for chicken drove our results during our second fiscal quarter.

* * *

The Georgia dock price remains at a record high and reflects excellent demand for chicken at retail grocery stores.

* * *

I feel okay about the Georgia Dock through Labor Day, that may not come down a quarter or half after July 4 but it's not going to come down a lot, I don't believe

Defendant Sanderson went on to comment on industry discussion and "anxiety" regarding production increases and how that might affect chicken prices going forward but did not acknowledge that in the past those concerns had led to prior coordinated broiler supply restrictions and egg destruction to keep prices steadily inflated:

In addition to our costs, we will be closely watching the chicken markets and production number. Weekly egg sets continue to trend higher than a year ago and the breeding flock is getting larger. There has been a significant amount of discussion one might even say anxiety regarding the recent increase in pullet placements and what that increase might mean for future chicken suppliers.

* * *

We continue to believe the industry will process between 3% and 4% more head of chickens during 2015 and that weight gains will add another 3% to pounds.

As for 2016, we will know about that when we get there. We continue to believe at some point the industry will run into a processing capacity ceiling, but we cannot say for certain where that ceiling is. Despite higher production numbers, prices have held up well, assuming the industry can produce another 2.5% to 3% more head of chickens in 2016 before hitting the processing wall, it is possible the market can absorb that production.

113.    Defendant Sanderson also referenced capacity limitations that occurred in 2008 and 2011, precisely two years in which Sanderson Farms and its industry peers engaged in massive coordinated reductions of broiler chicken supply, the results of which reverberated

during the Class Period, but did not admit to the collusive conduct that led to the capacity limitations:

**Kenneth Zaslow**

Okay. And the other question I have is, can you - you talk about processing capacity limit, limiting, being limited. How do you, again, assess that there is a limitation? Where along the chain is it limited?

**Joe Sanderson**

We think its primarily in the processing plants and it's a guess and it goes back to a calculation that begin in 2008 with the closure of some plants in 2008 and if you all go back and remember what, there were five plants closed in 2008, until those plants were reopened that lays three plants closed and then there were - how many plants closed in 2011, two more plants closed in 2011 and then there were some - we believe some rationalization of some capacity and addition to that.

114.    Later in the call, Defendant Butts once again commented on the high price of chicken reflected on the Georgia Dock index without admitting that collusive conduct created that inflated price:

The average Georgia Dock price during our second quarter was 8.1% higher than last year second quarter averaging a $1.14 per pound during the quarter compared to $1.06 per pound last year.

The Georgia Dock price for this week is a $1.16 per pound, which compares to $1.095 per pound for the same week last year. The Georgia Dock price reflects continued strong demand for chicken in retail grocery stores and remains at record levels.

115.    The foregoing statements, made by Defendants on May 28, 2015, were false and misleading for the reasons stated in paragraph 85 above.

116.    On August 25, 2015, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended July 31, 2015 (the "Q3 2015 10-Q").   In the Q3 2015 10-Q, Defendants once again falsely claimed that the "Company competes with regional and national

firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

117.    On August 25, 2015, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q3 2015 10-Q (the "Q3 2015 8-K").  In the Q3 2015 8-K, Defendant Sanderson stated, in part, that "Sanderson Farms' financial results for the third quarter of fiscal 2015 reflect continued good demand for fresh chicken at retail grocery stores, which demand was reflected in a Georgia dock whole bird price that remained near record levels during the quarter."  The press release also repeated the false representation that Sanderson Farms "competes" with its industry peers.

118.    On an earnings call that same day, attended by all three Individual Defendants, a transcript of which was attached to the Q3 2015 8-K as an Exhibit, Defendant Sanderson stated as follows:

> The Georgia dock whole bird price remained at near record levels through the quarter…
>
> ***
>
> Grain costs were lower during our third fiscal quarter and the first nine months of the year compared to last fiscal year.

Defendant Butts also commented on the Georgia Dock index record pricing without mention of the Company's collusive conduct:

> One exception to that was the Georgia dock whole bird price, which during our third quarter averaged $1.16 per pound compared to a $1.11 per pound averaged during last year's third quarter.
>
> The Georgia dock price for this week is a $1.155 per pound, which compares to $1.1275 per pound for the same week last year. The Georgia dock price continues to reflect good demand for chicken in retail grocery stores.

119.    The foregoing statements, made by Defendants on August 25, 2015, were false and misleading for the reasons stated in paragraph 85 above.

120.    On December 17, 2015, Sanderson Farms filed an Annual Report on Form 10-K with the SEC, signed by each Individual Defendant, announcing the Company's financial and operating results for the quarter and fiscal year ended October 31, 2015 (the "2015 10-K").  In the 2015 10-K, Defendants once again falsely claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

121.    In the 2015 10-K, Sanderson Farms stated, in part:

**Competition**

The Registrant is subject to significant competition from regional and national firms in all markets in which it competes. Some of the Registrant's competitors have greater financial and marketing resources than the Registrant.

The primary methods of competition are price, product quality, number of products offered, brand awareness and customer service. The Registrant has emphasized product quality and brand awareness through its advertising strategy.

122.    Regarding the Georgia Dock index, the 2015 10-K further stated:

The Georgia Dock whole bird price is published each week by the Georgia Department of Agriculture and is based on its survey of prices and market conditions during the preceding week.

*** 

Generally, the Registrant prices much of its chicken products based upon weekly and daily market prices reported by the Georgia Department of Agriculture and by private firms. Consistent with the industry, the Registrant's profitability is affected by such market prices, which may fluctuate substantially and exhibit cyclical and seasonal characteristics. The Registrant will adjust base prices depending upon value added, volume, product mix and other factors. While base prices may change weekly and daily, the Registrant's adjustments are generally negotiated from time to time with the Registrant's customers. The Registrant's sales are generally made on an as-ordered basis, and the Registrant maintains some long-term sales contracts with its customers. These agreements, which provide for the pricing of product based on formulas that use market prices

reported by the Georgia Department of Agriculture and by private firms, as well as various other guidelines for the relationship between the parties, do not require the customers to purchase or the Company to sell any specific quantity of product.

*** 

The quoted Georgia Dock whole bird price, which reached its historical high during the Company's third fiscal quarter of 2015, averaged 5.6% higher during fiscal 2015 as compared to the average during fiscal 2014.

123.   On December 17, 2015, Sanderson Farms issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the 2015 10-K (the "2015 8-K").  The press release also reiterated that, *"The company competes with regional and national firms."*

124.   That Company also held an earnings call that day, attended by all three Individual Defendants, a transcript of which was also attached to the 2015 8-K as an Exhibit.  During the call, Defendant Sanderson stated in relevant part:

… We finish the year in a *competitive* position in our industry…

Then, attributing a false cause to the record prices reflected on the Georgia Dock index, Defendant Sanderson stated:

And the retail price of beef and pork have really not come down appreciably, the grocery stores are maintaining their margins on beef and pork. They are not taking their price down on beef and pork. So that's one reason Georgia dock is staying as high it is. There's not additional volume of chicken either in that space, at retail and that's another reason Georgia dock is staying where it's staying.

*** 

We think it's going to remain pretty close to what it did in 2015, we think it's going to be firm and there is not additional volume in that market space. Our outlook is good for the Georgia dock and for retail chicken sales.

Defendant Butts also spoke about the record pricing on the Georgia Dock index with nary a mention of Sanderson Farm's coordination with others in the industry to keep that price inflated well above comparable indices:

> The average Georgia dock price during our fourth quarter was approximately 1.2% higher than last year's fourth quarter averaging a $1.15 per pound for the quarter. For the year the Georgia dock averaged to $1.15 per pound which represented a 5.6% increase over the $1.09 per pound averaged during fiscal 2014. The Georgia dock price is currently a $1.13 per pound.

125.   The foregoing statements, made by Defendants in December 2015, were false and misleading for the reasons stated in paragraph 85 above.

126.   On February 25, 2016, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended January 31, 2016 (the "Q1 2016 10-Q").   In the Q1 2016 10-Q, Defendants once again falsely claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels.

127.   On February 25, 2016, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q1 2016 10-Q (the "Q1 2016 8-K").   In the press release, wherein Defendants once again represented that Sanderson Farms "competes" in the industry, Defendant Sanderson also stated, in part, that "broiler egg sets have been only slightly higher than the previous year's levels in recent weeks and, we believe, reflect caution on the part of some in light of the challenging export market environment."

128.   That same day, the Individual Defendants participated in an earnings call, a transcript of which was attached to the Q1 2016 8-K as an Exhibit. During the call BMO Capital

Markets analyst Ken Zaslow noted the broiler industry's history of volatility in pricing and profitability for chicken companies and questioned why that had changed.   In response Defendant Sanderson continued to hide the collusive anticompetitive conduct that Sanderson Farms and its industry peers engaged in to fix elevated prices and avoid that historical volatility:

**Kenneth B. Zaslow - BMO Capital Markets (United States)**

Okay. Fair enough. And then just to make sure I get this, the chicken industry, if you go back into history, there's always so much volatility year to year that one year you can lose money, another year you can make money. But this time around, you didn't – we had a very quick period of time where you kind of hit the bottom, November-December, and it already seems like it's already recovering. Is there something that – and I always hate to be the person that says, oh, this time it's different. But I guess what I'm trying to figure out is why did we not go into the losses that you've historically seen given how strong the profitability was six months to nine months ago? And can you help us understand maybe if there's any changing of the industry dynamic, how you see it?

**Joe F. Sanderson Jr. - Chairman & Chief Executive Officer**

I don't know why it – there isn't an expansion going on. It looked like it with the pullet placements. But we might be at a capacity wall, you know? And some of the larger players may be at capacity and have not added any capacity. And some of the smaller ones may be at capacity. Where's the egg set? Bang up there. If you look at your 19 State egg set, the industry hasn't set – what's the biggest egg set in the last four years? 211 million?

**D. Michael Cockrell - Treasurer and Chief Financial Officer & Director**

Yeah. (35:56) 211.6 million.

**Joe F. Sanderson Jr. - Chairman & Chief Executive Officer**

And that may be it. We've added a couple of plants, but nobody else has really done that. And the USDA did not come out with the new line speeds. And so you might be at a capacity. Since back in 2007, on the 19 State total, the industry was setting 220 million eggs. That was the max. Since that time, there are three or four plants shuttered. And I don't know what the capacity is right now, but we think it's less than 220 million eggs. We thought it was going to be 215 million or 216 million frankly, but I don't know if it's because in November and December there were several companies losing money, big bird typically, and exports were not favorable. And so everybody – some people are being very cautious, particularly in the big bird arena. It does feel different.

51

129.    The foregoing statements, made by Defendants on February 25, 2016, were false and misleading for the reasons stated in paragraph 85 above.

130.    On May 26, 2016, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended April 30, 2016 (the "Q2 2016 10-Q").  In the Q2 2016 10-Q, Defendants once again falsely claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels, which failed to reveal Defendants' collusive activities with fellow poultry producers (described above) that rendered Sanderson Farms vulnerable to antitrust litigation, regulatory scrutiny, and reputational damage.

131.    On May 26, 2016, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q2 2016 10-Q (the "Q2 2016 8-K").  In the press release, which reiterated the false statement that Sanderson Farms "competes" within the industry, Defendant Sanderson also stated, in part:

> With respect to production numbers, while 2016 breeder placements have significantly outpaced 2015 placements, it appears many of those breeders have been placed to produce hatching eggs for export markets. Broiler egg sets in domestic hatcheries over the past few weeks continue to run below last year's numbers, while broiler live weights were up approximately 1.5 percent through March. The current USDA forecast for broiler production during calendar 2016 to increase approximately 2.8 percent over calendar 2015 seems reasonable, but may prove to be high should egg sets continue to trail last year's numbers.

132.    Defendants held an earnings call that same day, attended by all three Individual Defendants, a transcript of which was attached to the Q2 2016 8-K.  On that call, Defendant Sanderson talked about the quarterly results and the Georgia Dock index without mentioning that

collusive conduct within the industry, in which Sanderson Farms participated, drove those results:

> Lower grain costs, continued good demand for chicken at retail grocery stores, higher volumes, and improved export markets drove our results during our second fiscal quarter.
>
> ***
>
> The Georgia dock price remained steady and reflects good demand for chicken at retail grocery stores.

Defendant Butts similarly spoke about the Georgia Dock index, attributing the record high pricing to "good demand" rather than collusive conduct:

> The average Georgia dock price during our second quarter was 2.4% lower than last year's second quarter, averaging $1.12 per pound during the quarter compared to $1.14 per pound last year. The Georgia dock price for this week is $1.12 per pound, which compares to $1.16 per pound for the same week last year. The Georgia dock price reflects continued good demand for chicken in retail grocery stores.

133.    The foregoing statements, made by Defendants on May 26, 2016, were false and misleading for the reasons stated in paragraph 85 above.

134.    On August 25, 2016, Sanderson Farms filed a Quarterly Report on Form 10-Q with the SEC, signed by Defendant Cockrell, announcing the Company's financial and operating results for the quarter ended July 31, 2016 (the "Q3 2016 10-Q").  In the Q3 2016 10-Q, Defendants reported net income for the third fiscal quarter of $54.7 million or $2.42 per share, as compared to net income of $50.9 million or $2.27 per share during last year's third quarter. Defendants also once again falsely claimed that the "Company competes with regional and national firms" and repeated its prior misleading statements regarding the market prices of poultry and inventory levels, which failed to reveal Defendants' collusive activities with fellow poultry producers (described above) that rendered Sanderson Farms vulnerable to antitrust litigation, regulatory scrutiny, and reputational damage.

135.    On August 25, 2016, Sanderson Farms also issued a press release, subsequently filed as an Exhibit to a Current Report on Form 8-K with the SEC, signed by Defendant Cockrell, reiterating certain of the financial and operating results previously announced in the Q3 2016 10-Q (the "Q3 2016 8-K").   In the press release, which reiterated the false representation that the Company "competes" within the industry, Defendant Sanderson also stated, in part:

> Sanderson Farms' financial results for the third quarter of fiscal 2016 reflect a continued favorable balance of the supply and demand for fresh chicken sold to retail grocery store customers. . . . That balance was reflected in a Georgia Dock whole bird price that, while lower on average than during last year's third fiscal quarter, remained strong during the current third fiscal quarter. Market prices for products from our plants that process a larger bird were mixed during the quarter when compared with last year's third fiscal quarter.

136.    That same day, Defendants held an earnings call, attended by each Individual Defendant, a transcript of which was attached as an Exhibit to the Q3 2016 8-K.   On that call, Defendant Sanderson and Defendant Butts once again touted the strong pricing on the Georgia Dock index without revealing their collusive activities that contributed to that pricing. Defendants also confirmed, as they did on all prior earnings calls during the Class Period that feed costs, which counted toward almost half of their "cost of goods sold," were low.

137.    The statements referenced in the foregoing paragraphs were materially false and misleading because Sanderson Farms did not compete with its industry peers but instead engaged in collusive conduct, facilitated by their extensive information sharing via Agri Stats, to prop up broiler prices through systematic reductions of the broiler supply, destruction of eggs, and manipulation of poultry prices reflected on the Georgia Dock index.   Defendants failed to reveal that increased poultry prices, the high Georgia Dock index pricing, and their earnings therefrom resulted from anticompetitive conduct that rendered Sanderson Farms vulnerable to litigation and regulatory scrutiny for potential violations of the federal antitrust laws as well as reputational damage.

**The Truth Emerges**

138.    On October 4, 2016, following the filing of several antitrust complaints against chicken producers including Sanderson Farms, a group of individual consumers filed an antitrust class action complaint in U.S. District Court for the Northern District of Illinois against Sanderson Farms and several of its industry peers, including Tyson, alleging violations of the Sherman Act.  Specifically, the Monahan Complaint alleged, in part:

> [Defendants] now electronically transfer vast amounts of production data . . . [to] provide[] Defendant Producers with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies.  This permits the Defendant Producers to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on broiler breeder flock data that is reported and shared.
>
> . . .
>
> Defendant Producers' restriction of broiler supply had the intended purpose and effect of increasing broiler prices to Plaintiffs and the Class.  As a result of Defendant Producers' unlawful conduct, Plaintiffs and the other members of the Class paid artificially inflated prices for broilers during the Class Period.

139.    Following the filing of the Monahan Complaint, Sanderson Farms' share price fell $3.98, or 4.14%, to close at $92.21 on October 4, 2016.

140.    In both filings with the SEC and on earnings calls, Sanderson Farms has denied the antitrust charges against it indicating its intent "to defend it vigorously."

141.    On October 7, 2016, Pivotal Research downgraded Tyson from "Hold" to "Sell" stating, "if poultry seems too good to be true, it may be."  Explaining the downgrade, analyst Timothy Ramey cited the "powerfully convincing" allegations of price manipulation by the defendants named in the Maplevale Complaint, which includes Sanderson Farms.  As Ramey cogently recognized, the major risks created by Sanderson Farms' and its cohorts activities during the Class Period with regard to broiler pricing include a finding of industry collusion,

antitrust violations, and potential scrutiny by the Department of Justice or Federal Trade Commission.

142.    Regarding the allegations of collusion against the industry participants, of which Sanderson Farms is a part, Ramey noted in this report that, "the evidence is quite chilling. There is no easy way to explain the perfect harmony that the industry has operated in since 2009." Pivotal observed that it had "long wondered how an industry marked by such volatility and lack of discipline, could morph to a highly disciplined industry where production remains constrained and pricing remains high." Pivotal noted that the *Maplevale* Complaint "infers that it is the invisible hand of Agri Stats rather than the market that is providing production cues to industry participants." As a result, Pivotal concluded that "the narrative of this suit fits the fact-pattern of poultry pricing and margins over the past seven years. If true, it explains a lot."

143.    On news of the downgrade by Pivotal Research, Sanderson Farms' share price fell $4.03, or 4.32%, to close at $89.15 on October 7, 2016.

144.    Sanderson and other poultry producers' machinations with regard to the Georgia Dock index were unknown to the market until November 2016, when it became public that the USDA had requested in July 2016 that the GDA investigate and verify the accuracy of the broiler prices provided to the GDA by Sanderson Farms and its co-conspirators. When the GDA declined to do so, citing the industry's and its own lack of interest in verifying prices, the USDA began publishing its own broiler price statistic, which confirmed that the Georgia Dock price was inflated over already supra-competitive prices.  Indeed, so hidden was the plot to prop up the Georgia Dock index price that it did not even appear in the first round of antitrust complaints filed against Sanderson Farms and its co-conspirators in September and October 2016.

145.    Specifically, on November 3, 2016, when The New York Times published an article titled, "You Might be Paying Too Much for Your Chicken."   In that article, reporter Stephanie Strom observed that beef and pork prices declined as a result of lower prices for corn and soybeans, "But chicken? Steady as she goes."   The New York Times article reported for the first time that the United States Department of Agriculture ("USDA") initiated an inquiry into the Georgia Dock index, calling the index "obscure outside the food industry."   The USDA questioned the accuracy of the unverified data Sanderson Farms and its industry peers provided for compilation of the index.   As the New York Times explained, the inaccuracy of that data is evidenced by the sharp discrepancy between the pricing on the Georgia Dock index as compared to the Urner Barry index.   For example, during the week the New York Times published its article, the market price of a 2 ½ to 3 ½ pound chicken on the Georgia Dock index was $1.10 a pound while the same size chicken was price at $.72 a pound on Urner Barry.

146.    Emails obtained by the New York Times from the USDA pursuant to a Freedom of Information Act request indicated that the GDA agreed, "with the poultry industry that there is no desire to review invoices for verification of data reported." As a result, the USDA dropped the Georgia Dock from its weekly report in August 2016.

147.    Defendant Cockrell admitted to the New York Times that, "[a]ll but one of the grocery stores that buy from Sanderson use the Georgia Dock to negotiate prices." Unambiguously identifying one of Defendants' motives for colluding to keep the Georgia Dock index pricing high, Defendant Cockrell also conceded to the New York Times that "The retail grocery store remains the strongest market for chicken…We were profitable in the fourth quarter of last year, for instance, only because we were making money from the chicken we were selling to the retail market."

148.    Following publication of the New York Times article, Sanderson Farm stock plummeted $6.31, or almost 7%, on unusually high volume.

149.    Then, on November 17, 2016, The Washington Post published an article titled, "If you thought you were paying fair prices for chicken at the supermarket, think again."  The article revealed new information, provided by director Arty G. Schronce from the Georgia Department of Agriculture, demonstrating that Sanderson Farms and its major competitors (including Tyson and Pilgrim's) have been manipulating the Georgia Dock index to prop up chicken prices.  As the Post explained, "The price average from Schronce directly affects what big retailers such as Walmart and Safeway pay for chicken — it's often built into supermarket purchasing contracts — and that price is then passed along to shoppers. It has, in other words, affected billions of dollars in purchases."  Producers "rely" on this index to set the price of its long term contracts. According to an internal email from the Georgia department of agriculture that the Post obtained, Schronce questioned the accuracy of the data, which is provided to him by eight anonymous chicken companies, as the companies are not asked to verify the provided data with receipts or other documentation ("Schronce Memorandum").

150.    According to the Washington Post article, Mr. Schronce wrote in the Schronce Memorandum that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." Mr. Schronce also reported that the broiler companies reporting prices to him gave

"lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when asked for a company's updated broiler price.

151.    Mr. Schronce also questioned the Advisory Board, writing, "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board."

152.    Dispelling any doubt over whether Defendants knew that its customers relied on the accuracy of the Georgia Dock index pricing, the Washington Post also cited correspondence from Sanderson Farms to the SEC earlier in 2016, which stated, "[o]ver time, most retail grocery customers and their suppliers have come to trust the Georgia Dock whole bird price quoted weekly by the Georgia Department of Agriculture as the most reliable reflection of the supply and demand dynamics of the fresh chicken market." Indeed, for all but one of Sanderson's supermarket customers, the price is based on the Georgia Dock.

153.    In response to these shocking revelations, Sanderson Farms stock price continued to plummet for the next three consecutive trading days on unusually high volume, closing on November 21, 2016 at $78.98—a three day loss of almost 8%.

154.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## POST CLASS PERIOD EVENT

155.    On February 22, 2017, Sanderson Farms filed a Form 8-K with the SEC signed by Defendant Cockrell, which stated as follows:

> On February 21, 2017, Sanderson Farms, Inc. (the "Registrant") received an antitrust civil investigative demand from the Office of the Attorney General, Department of Legal Affairs, of the State of Florida. The Registrant intends to

cooperate fully with the investigative demand. Among other things, the demand seeks information related to the Georgia Dock Index and other information on poultry and poultry products published by the Georgia Department of Agriculture and its Poultry Market News division.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

156.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sanderson Farms securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

157.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sanderson Farms securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sanderson Farms or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

160.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sanderson Farms;

- whether the Individual Defendants caused Sanderson Farms to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Sanderson Farms securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

162.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sanderson Farms securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Sanderson Farms securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

163.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

165.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sanderson Farms securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Sanderson Farms securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

168.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sanderson Farms securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sanderson Farms' finances and business prospects.

169.   By virtue of their positions at Sanderson Farms, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

170.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Sanderson Farms securities from their personal portfolios.

171.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Sanderson Farms, the Individual Defendants had knowledge of the details of Sanderson Farms' internal affairs.

172.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sanderson Farms.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sanderson Farms' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of Sanderson Farms securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Sanderson Farms' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Sanderson Farms securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

173.    During the Class Period, Sanderson Farms securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sanderson Farms securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sanderson Farms securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Sanderson Farms securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

174.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

176.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.    During the Class Period, the Individual Defendants participated in the operation and management of Sanderson Farms, and conducted and participated, directly and indirectly, in the conduct of Sanderson Farms' business affairs.  Because of their senior positions, they knew the adverse non-public information about Sanderson Farms' misstatement of income and expenses and false financial statements.

178.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sanderson Farms' financial condition and results of operations, and to correct promptly any public statements issued by Sanderson Farms which had become materially false or misleading.

179.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sanderson Farms disseminated in the marketplace during the Class Period concerning Sanderson Farms' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sanderson Farms to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sanderson Farms within the meaning of Section 20(a) of the Exchange

Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sanderson Farms securities.

180.    Each of the Individual Defendants, therefore, acted as a controlling person of Sanderson Farms.  By reason of their senior management positions and/or being directors of Sanderson Farms, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sanderson Farms to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Sanderson Farms and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

181.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sanderson Farms.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 30, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Tamar A. Weinrib*

Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Plaintiff*